**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3032
_____

| | | |
|---|---|---|
| Marlise Grebenick, | * | |
| | * | |
| Plaintiff - Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Nebraska. |
| | * | |
| Shirley S. Chater, | * | |
| Commissioner of Social | * | |
| Security Administration, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: March 13, 1997

Filed: August 6, 1997
_____

Before McMILLIAN, FLOYD R. GIBSON, and HANSEN, Circuit Judges.
_____

HANSEN, Circuit Judge.

Marlise Grebenick appeals from a judgment of the district court[1] affirming a denial of disability insurance benefits under Title II of the Social Security Act. The district court concluded that Mrs. Grebenick was not "disabled" at the time her insured status ended on September 30, 1982. We affirm.

I.

A. Factual Background

Marlise Grebenick was born in September 1943. She was a high school graduate, was trained as a Licensed Practical Nurse, and worked as a secretary. She married Albert Grebenick in 1976. When she had her first child in 1977, she quit her secretarial work to stay home and work as a housewife and mother. The Grebenicks had their second child in April of 1981. Within a few months, Mrs. Grebenick began experiencing the first signs of what was later diagnosed as multiple sclerosis.

The early period of Mrs Grebenick's illness is not well documented. Although the record indicates that she encountered her first noticeable symptoms shortly after giving birth to her second child in April 1981, she did not see a doctor about them until August 1983. There are few medical records concerning Mrs. Grebenick prior to that date. After delivering her second child in 1981, she saw her doctor twice concerning birth control matters. In April 1982, she had her yearly gynecological exam, during which she complained of being tired. Finally, she was seen in an emergency room on May 31, 1982, because she had sustained a laceration to her eyebrow as a result of tripping while carrying a folding chair. In

---

[1]The Honorable William G. Cambridge, Chief Judge, United States District Court for the District of Nebraska.

the miscellaneous portion of the ER form, the doctor noted, "moves all extremities well; minor abrasion to left knee." (Admin. Agency R. at 117.)

On August 9, 1983, Mrs. Grebenick was admitted to the hospital for "evaluation and treatment of symptoms present for two years." (Id. at 118.) The history section of the medical records states that Mrs. Grebenick first developed "numbness and tingling in her feet" about three months after the birth of her youngest child, about two years prior to her hospitalization. (Id. at 119.) "She then noted it was difficult and uncomfortable to walk. These symptoms persisted, and actually for a year, she noted no change and did relatively well." (Id.) The symptoms varied from day to day, but by the time she was hospitalized, she had had trouble walking for about a year. Approximately a month before her hospitalization in August 1983, the numbness and tingling had crept up to her waist bilaterally.

The medical records from the 1983 evaluation describe her as a pleasant, tense, 39-year-old woman who walked with a mildly unsteady gait. She had a decreased ability to perform rapid alternating movements with her feet and definite ataxia[2] on tandem walking. She had a clearly positive Romberg sign,[3] hyperactive reflexes in the lower extremities, markedly reduced position sense in the right lower extremity, and mildly reduced position sense in the left lower extremity. She also had no vibratory sensation at the ankles, knees, and hip. She had mild paraparesis (partial paralysis) distally in both lower extremities bilaterally. She was dismissed

---

[2]"Ataxia" is an inability to coordinate muscle activity during a voluntary movement, so that smooth movements cannot occur. A person with ataxia problems walks with her feet wide apart, slapping them clumsily to the floor with each step. The person also depends on visual cues to maintain balance, and may generally have balance problems.

[3]The "Romberg sign" is the inability to stand (feet together or slightly less than shoulder width apart) without becoming unsteady, swaying, or falling over.

from the hospital on August 12, 1983, and diagnosed with asymmetric posterolateral sclerosis.

The neurologist who conducted the hospital evaluation was Dr. John C. Goldner, whom Mrs. Grebenick continued to see until August of 1992. The doctor's progress notes reveal that Mrs. Grebenick's condition progressively declined over the years, although her health and her ability to control her symptoms "fluctuate[d] from time to time." (Id.) For example, Dr. Goldner's notes from an office visit on September 14, 1983, (a month after her hospital evaluation and a year after the expiration of her insured status) indicate that her paresthesia had disappeared but that she was still having some trouble walking. He told her then that the probable diagnosis was multiple sclerosis and recommended increased amounts of rest. Mrs. Grebenick's symptoms improved somewhat by her October 1983 appointment, and the progress notes from her December 1983 appointment indicate that rest helped her significantly and she had "definitely improved" from her earlier appointments. (Id.) Over the long term, however, her condition declined. In October of 1985, she experienced an exacerbation of her symptoms, increasing her fatigue and her difficulty in walking. By February of 1988, Mrs. Grebenick was walking with a cane.

In February 1992, Mrs. Grebenick was seen by another doctor and completed a Patient Case History for that doctor. When asked how long she had had her condition, she answered that she had been diagnosed in 1983. When asked how long it had been since she had really felt good, she answered, "5 years ago." (Id. at 124.)

In November 1992, Mrs Grebenick entered a nursing home. At that time, her disease had progressed to the point where she was totally unable to take care of her

4

physical needs.  Mrs. Grebenick died in November 1996, after this appeal was filed but before we heard oral arguments in the case.[4]

### B.  Procedural History

Mrs. Grebenick applied for disability insurance benefits on December 3, 1992, alleging that she had been unable to work since May 15, 1982.  For Mrs. Grebenick to receive benefits, she needed to show that her disability began on or before the expiration of her insured status on September 30, 1982.  The case proceeded to a hearing before an ALJ.  Mrs. Grebenick was not at the hearing herself, but her husband testified on her behalf.

Mr. Grebenick testified that, in 1981, Mrs. Grebenick needed to take two- to three-hour naps because of fatigue.  He said she encountered severe vision difficulties, so that she was unable to read more than a couple of paragraphs at a time.  He claimed she had to hold on to the wall in order to walk and was using a cane in early 1982.  Mr. Grebenick also testified she had difficulty eating because of numbness in her hands.  He stated that prior to September 30, 1982, she was unable to bend over without falling.  He said her activities consisted basically of resting and occasionally washing a few dishes.  Mr. Grebenick cited the incident leading to the emergency room visit as an example of Mrs. Grebenick's symptoms, explaining that she fell while attempting to carry a folding chair.

Mrs. Grebenick submitted a letter dated July 26, 1994, from Dr. Goldner, outlining her medical history.  In the letter, Dr. Goldner stated that he began seeing

---

[4]Although we were informed at oral argument that Mrs. Grebenick was deceased, we review the case in the context as it appeared before the ALJ. Consequently, we find it easier to refer to the late Mrs. Grebenick in the present tense, rather than the past tense.

her in 1983 for symptoms that had begun two years earlier in 1981. The doctor concluded "she was disabled from working prior to August 1982 because of the multiple sclerosis." (Id. at 135.)

Finally, Mrs. Grebenick also submitted the affidavits of two persons who were her neighbors during the time between the summer of 1981 when the symptoms began to appear and September of 1982, when Mrs. Grebenick's insured status expired. Both neighbors claimed that Mrs. Grebenick had tingling and numbness in her hands and feet, excessive fatigue, and difficulty walking, so that she frequently stumbled and used a wall, chair or handrail for support.

The ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520 to determine whether Mrs. Grebenick was disabled on or before September 30, 1982. First, he found that she had not performed substantial and gainful work activity since the date she alleged she had become disabled. Second, he found that she had suffered from a medically determinable impairment (symptoms of multiple sclerosis) prior to September 30, 1982, and the impairment limited her ability to perform basic work-related functions.

At the third step of the analysis, however, the ALJ found that her impairment did not amount to a disability due to multiple sclerosis, as listed in the Social Security Administration Regulations, because her symptoms were not severe enough before September 30, 1982. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.09 (1996). The ALJ noted that he discounted Dr. Goldner's conclusion in 1994 that she was disabled from working prior to August 1982, because the doctor's retrospective conclusion was inconsistent with his contemporaneous progress notes. Applying the standard in Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), the ALJ found Mr. Grebenick's testimony on behalf of his wife lacking in credibility because in many aspects, it too was inconsistent with the medical progress notes. For the same reason, the ALJ rejected the affidavits of the two neighbors who corroborated

6

Mr. Grebenick's testimony regarding Mrs. Grebenick's condition before September 30, 1982. Thus, the ALJ relied heavily on the contemporaneous medical records (or lack thereof) and the subsequent records of Mrs. Grebenick's treatment beginning in August of 1993. Based on this evidence, the ALJ concluded that Mrs. Grebenick had failed to prove she was disabled for Social Security purposes on or before September 30, 1982.

The ALJ nonetheless gave Mrs. Grebenick "every benefit of the doubt with regard to any conflicts or contradictions contained in the clinical and laboratory findings of record." (Admin. Agency R. at 23.) Upon review of the medical records, the ALJ concluded for purposes of the fourth step of the analysis that Mrs. Grebenick was "incapable of performing occupations requiring lifting in excess of 10 pounds, prolonged standing, [or] excessive walking and/or climbing." (Id.) Even with these limitations, however, the ALJ found that Mrs. Grebenick had been able to perform her past relevant work as a secretary through September 30, 1982.

Without needing to, the ALJ proceeded to the fifth step of the analysis. He found that as of September 30, 1982, Mrs. Grebenick was able to perform "sedentary" jobs, of which there were plenty in the national market. The ALJ concluded that Mrs. Grebenick was not entitled to disability benefits.

Mrs. Grebenick appealed the ALJ's decision on numerous grounds. The Appeals Council denied her request for review, and thus the ALJ's decision stands as the Commissioner's final decision. Mrs. Grebenick sought review in federal district court, and the Commissioner's decision was affirmed. Mrs. Grebenick now appeals to this court.

Mrs. Grebenick submits a number of challenges to the ALJ's decision. "Our task on review is to determine whether the denial of benefits is supported by substantial evidence in the record as a whole." Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996); see also 42 U.S.C. §§ 405(g), 1383(c)(3) (1994). "To do so, we must evaluate the evidence in the record [that] supports the ALJ's decision as well as that which detracts from it." Gaddis, 76 F.3d at 895. "We may not reverse merely because substantial evidence would have supported an opposite decision." Id. (internal quotations omitted).

The overarching issue in this case is the question of whether Mrs. Grebenick actually was disabled as defined for Social Security purposes by her multiple sclerosis before her insured status expired. The five-step sequential evaluation process set forth at 20 C.F.R. §§ 404.1520 and 416.920 guides our inquiry:

> "First the [Commissioner] determines whether the claimant is presently engaged in a `substantial gainful activity.' Second the [Commissioner] analyzes whether the claimant has a severe impairment -- one that significantly limits the claimant's physical or mental ability to perform basic work activities. Third, the [Commissioner] determines whether the claimant has an impairment that meets or equals an impairment listed in the regulations; if so, the [Commissioner] finds that the claimant is disabled without considering the claimant's age, education and work experience. Fourth, the [Commissioner] considers the claimant's residual functional capacity and the physical and mental demands of the claimant's past work to determine whether the claimant can still perform the work. If the claimant has the residual capacity to perform that work, the [Commissioner] finds that the claimant is not disabled. Finally, if the [Commissioner] determined that the claimant cannot perform the past work, the [Commissioner] determines whether any substantial gainful activity exists in the national economy which the claimant can perform."

Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997) (quoting Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

The parties agree that Mrs. Grebenick met the first two steps of the five-step analysis; she was not working, and she established that she suffered some symptoms of multiple sclerosis prior to the expiration of her insured status. We turn then to the third inquiry -- whether substantial evidence supports the ALJ's finding that Mrs. Grebenick's impairment as of September 30, 1982, did not rise to the severity of the listing criteria.

Multiple sclerosis is listed as a disability under the Act. To meet the standard of the multiple sclerosis listing as it applies to persons with disorganization of motor function, 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.09A,[5] a claimant must suffer from "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." Id. § 11.04B.

Initially, Mrs. Grebenick argues that the ALJ failed to make a determination on whether her condition prior to September 30, 1982, met the listing criteria for multiple sclerosis. This argument has no basis in the facts, because the ALJ specifically found that "her impairment, on/or before September 30, 1982, did not reveal the same or equivalent attendant medical findings as are recited in Appendix I to Subpart P of the Social Security Administration's Regulation's No. 4, but did impose limitations upon her ability to perform basic work-related functions." (Admin. Agency R. at 24.)

---

[5]The regulations recognize three forms of multiple sclerosis: disorganization of motor function, visual or mental impairment, and significant fatigue demonstrated on physical examination. Id. § 11.09A-C.

Alternatively, Mrs. Grebenick argues that the ALJ erred in reaching his conclusion, because the evidence overwhelmingly indicates she had met the multiple sclerosis listing requirements prior to September 30, 1982. Mrs. Grebenick submitted four types of evidence supporting her claim that she was disabled before the expiration of her insured status on September 30, 1982: (1) the limited medical evidence prior to her hospitalization in August of 1983; (2) the medical evidence documenting her condition from 1983 through her death, including the hospital records and Dr. Goldner's contemporaneous progress notes; (3) Dr. Goldner's July 1994 letter relating her history with multiple sclerosis and concluding that she was disabled before September 30, 1982; and (4) the subjective lay evidence, including the testimony of her husband and her neighbors. Because of the paucity of medical evidence documenting her condition before her insured status expired, Mrs. Grebenick relied primarily on the latter three types of evidence to establish her disability.

In a case involving a degenerative disease such as multiple sclerosis, where a claimant does not have contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnosis of her doctor. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). We look first at the retrospective conclusions set forth by Dr. Goldner.

"If the [treating doctor's retrospective] diagnosis is based upon a medically accepted clinical diagnostic technique, then it must be considered in light of the entire record to determine whether it establishes the existence of a physical impairment prior to the expiration of the claimant's insured status." Id. at 1169 (internal quotations omitted). "A treating physician's opinion is generally entitled to substantial weight; however, such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994).

10

Based upon his progress notes dating as far back as 1983, Dr. Goldner concluded in his July 1994 letter that Mrs. Grebenick suffered from multiple sclerosis prior to September 30, 1982. After outlining her medical history through 1992, he stated, "Clearly Mrs. Grebenick is unable to work at any job in the competitive market for at least a twelve month period and will never be able to do so. In my opinion, she was disabled from working prior to August 1982 because of the multiple sclerosis." (Admin. Agency R. at 135.) The ALJ rejected this conclusion, finding that the documentary evidence did not support a conclusion that Mrs. Grebenick was disabled at that time.

Upon careful review of the medical records, we find substantial support for the ALJ's determination that the clinical and diagnostic data is inconsistent with Dr. Goldberg's conclusion that Mrs. Grebenick was disabled for Social Security purposes before her insured status expired. The contemporaneous medical records show that she had balance problems in 1983, but she had experienced only numbness and tingling in her feet during the first year of her symptoms. The hospital record of August 1983 indicates only that she walked "with a mildly unsteady gait." (Admin. Agency R. at 118.) A month later, in September 1983, her paresthesia had disappeared. In October 1983, she stated that her legs hurt when she "was up too long" but that her balance was better. (Id. at 126.) We conclude that the symptoms documented in 1983 were not "significant" and "persistent," resulting in a sustained disturbance to Mrs. Grebenick's "gross motor and dexterous movements or gait and station." 20 C.F.R. § 11.04B. Because multiple sclerosis is a progressive disease, Mrs. Grebenick's symptoms prior to September 30, 1982, would likewise not have met the listing criteria. While the doctor's retrospective conclusions may accurately state that Mrs. Grebenick manifested symptoms of multiple sclerosis prior to September 30, 1982, the record does not support his conclusion that Mrs. Grebenick was "disabled" within the meaning of the listing criteria in the regulations. Because the doctor's conclusion is unsupported by his

11

medical records, the ALJ was free to reject his retrospective diagnosis.  See Prew v. Chater, 89 F.3d 841 (8th Cir. 1996).

We turn next to the subjective lay testimony.  Once the diagnosis is established, but the severity of the degenerative condition during the relevant period is unanswered, the claimant may fill the evidentiary gap with lay testimony. Basinger, 725 F.2d 1169.  The ALJ must consider this evidence, even if it is uncorroborated by objective medical evidence.  Id.  Under this standard, the ALJ's credibility determination of the lay witnesses becomes critical, because the ALJ is, of course, free to believe or disbelieve any or all of the lay witnesses.  Here, the ALJ fully considered the subjective evidence.  He discredited Mr. Grebenick's testimony because, in many respects, it was contrary to the medical records in the early years of Mrs. Grebenick's treatment.  We agree with the ALJ that the inconsistencies may understandably be due to the fact that Mr. Grebenick was attempting to recall his wife's specific condition 13 years ago, without the aid of any contemporaneous documentation.  The neighbors' affidavits are similarly inconsistent, possibly for the same expired-time reason.  In any event, we will not disturb the ALJ's credibility determinations.  Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

Mrs. Grebenick argues the ALJ erroneously required her to provide medical findings prior to September 30, 1982.  We agree with the district court that the ALJ considered the lack of contemporaneous medical evidence relating to her multiple sclerosis disease as one factor among several others in his credibility determination regarding the lay testimony.  There was no error in considering this factor.  See Polaski, 739 F.2d at 1322.

Mrs. Grebenick also contends that the ALJ improperly based his decision on the date of diagnosis, rather than on the date she became disabled.  The record

12

indicates otherwise.  The ALJ properly sought to determine whether Mrs. Grebenick was disabled on or before September 30, 1982.

Mrs. Grebenick next claims the ALJ failed to comply with Social Security Ruling (SSR) 83-20 by inferring the onset date of her disability without the aid of a medical advisor.  Once published, Social Security Rulings are "binding on all components of the Social Security Administration."  20 C.F.R. § 422.406(b)(1)(1996); see Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).  SSR 83-20 sets forth guidelines for determining the onset date of a claimant's disability.  The ruling defines the disability onset date as "the first day an individual is disabled as defined in the Act and the regulations."  SSR 83-20, 1983 WL 31249 (S.S.A.).  In determining the onset date for disabilities of nontraumatic origin, the ALJ should consider the applicant's allegations, her work history, and the medical and other evidence of her condition.

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.  Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. . . .
>
> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. . . .  If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in [the] file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. . . .  The impact

13

of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record.

SSR 83-20 (emphasis added).

The Commissioner argues that SSR 83-20 applies only for the limited purpose of determining the precise date of onset when the ALJ has already found that a claimant had established her disability and her entitlement to benefits. According to the Commissioner, the ALJ did not need a medical advisor to determine the onset of that disability in this case, because the ALJ determined that Mrs. Grebenick wasn't disabled during the time on or before September 30, 1982.

We cannot agree with the Commissioner's construction of SSR 83-20. The introduction to SSR 83-20 explains that the determination of the onset date is critical because "it may affect the period for which the individual can be paid and <u>may even be determinative of whether the individual is entitled to or eligible for any benefits</u>." SSR 83-20. This language plainly indicates the ruling is intended to apply to cases such as the one at bar.

It is important to understand that the issue of whether a medical advisor is required under SSR 83-20 does not turn on whether the ALJ could reasonably have determined that Mrs. Grebenick was not disabled before September 30, 1982. Rather, when there is no contemporaneous medical documentation, we ask whether the evidence is ambiguous regarding the possibility that the onset of her disability occurred before the expiration of her insured status. <u>See</u> <u>Reid v. Chater</u>, 71 F.3d 372, 374 (10th Cir. 1995) ("[A] medical advisor need be called only if the medical evidence of onset is ambiguous."). If the medical evidence is ambiguous and a retroactive inference is necessary, SSR 83-20 requires the ALJ to call upon the services of a medical advisor to insure that the determination of onset is based upon

14

a "legitimate medical basis."  SSR 83-20; DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to made the determination.").

We agree with the district court that the medical evidence in this case was unambiguous, thereby obviating the need for a medical advisor.  As we discussed above, the medical records of 1983 and 1984 indicate that Mrs. Grebenick's symptoms had not yet reached the disabling level of severity described in the multiple sclerosis listings.  Once again, because multiple sclerosis is a progressive disease, Mrs. Grebenick's failure to meet the listing criteria in 1983 and 1984 leaves no doubt that she also failed to meet them on or before September 30, 1982.  We therefore conclude that no ambiguity exists as to whether she was disabled before her insured status expired, and the ALJ did not err in failing to employ the assistance of a medical advisor.

After concluding that Mrs. Grebenick's symptoms did not meet the terms of the multiple sclerosis listing, the ALJ proceeded to the fourth step in the analysis -- determining whether Mrs. Grebenick could perform her past relevant work as a secretary.  Giving her the benefit of any doubt about her condition, as it was described in the medical documentation, the ALJ found that she was "incapable of performing occupations requiring lifting in excess of 10 pounds, prolonged standing, [or] excessive walking and/or climbing."  (Admin. Agency R. at 23.)   Even with these limitations, however, the ALJ concluded that Mrs. Grebenick was able to perform her past secretarial work.  The substantial evidence in the record as a whole supports this conclusion.

Because substantial evidence supports the Commissioner's conclusion that Mrs. Grebenick could perform her past relevant work, we need not inquire whether

15

she could perform other substantial gainful activity that existed in the national economy. We have carefully considered Mrs. Grebenick's remaining arguments and find them without merit.

## III.

In sum, we conclude that the ALJ considered all of the evidence, including the contemporaneous medical records, the medical records dating from 1983 through the time of the hearing, the subjective testimony, and the treating doctor's retrospective diagnosis. There is substantial evidence in the record as a whole supporting the ALJ's conclusion that while Mrs. Grebenick was impaired by her multiple sclerosis on September 30, 1982, her symptoms at that time did not meet the multiple sclerosis severity listing criteria. There is also substantial evidence supporting the ALJ's conclusion that, as of September 30, 1982, Mrs. Grebenick was capable of performing secretarial work. Therefore, the denial of benefits was proper.

We affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

16