Ferland v. SSA                    CV-97-456-M    07/24/98

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Diane J. Ferland,
    Plaintiff,

    v.                                      Civil No. 97-456-M

Kenneth S. Apfel, Commissioner
Social Security Administration,
    Defendant.


**O R D E R**

Pursuant to 42 U.S.C. § 405(g), plaintiff, Diane Ferland, moves to reverse the Commissioner's decision denying her application for Social Security Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423 (the "Act"). Defendant objects and moves for an order affirming the decision of the Commissioner.


**Factual Background**

**I.    Procedural History**

On November 17, 1994, plaintiff filed an application for disability insurance benefits under Title II of the Act, alleging that she had been unable to work since June 2, 1983 (plaintiff last met the disability status requirements on June 30, 1989 -- her "date last insured"). The Social Security Administration denied her application initially and on reconsideration. On May 9, 1995, plaintiff, her attorney, and a lay witness (plaintiff's husband) appeared before an Administrative Law Judge, who considered plaintiff's application de novo. On October 19, 1995,

the ALJ issued his order, concluding that plaintiff was not disabled prior to her date last insured and, therefore, not entitled to benefits under the Act.

Plaintiff then sought review of the ALJ's decision by the Appeals Council. On August 15, 1997, however, the Appeals Council denied her request, thereby rendering the ALJ's decision a final decision of the Commissioner, subject to judicial review. On September 12, 1997, plaintiff filed a timely action in this court, asserting that the ALJ's decision was not supported by substantial evidence and seeking a judicial determination that she is disabled within the meaning of the Act.

After reviewing the administrative record and the memoranda submitted by the parties, the court concluded that plaintiff's three page memorandum failed to properly identify (and develop) the precise nature of her claims. Rather than construe plaintiff's submissions as a waiver of her legal and factual arguments, the court afforded her additional time within which to "specifically identify the legal bases for her challenge to the ALJ's determination and to develop those arguments in sufficient detail (including citations to appropriate authority) so that the court may understand the precise nature of her legal and factual claims." Ferland v. Commissioner, No. 97-456-M, slip op. at 2 (D.N.H. May 29, 1998). Among other things, the court suggested that plaintiff address three specific issues which, at least in

2

the court's view, might arguably form the basis of a legitimate challenge to the ALJ's decision. Id. The parties have submitted additional memoranda and the matter is now ripe for review.

## II. Stipulated Facts

Pursuant to this court's local rule 9.1(d), the parties have submitted the following statement of stipulated facts which, with minor exceptions, the court quotes verbatim.

A. The Medical Record.

The medical evidence included records from plaintiff's childhood until 1995. In summary, the evidence showed the plaintiff has a long history of difficult movement of her extremities due to a condition diagnosed as dystonia.[1] Prior to her alleged date of disability onset in June of 1983, the plaintiff underwent two surgeries in 1966 and 1967 which greatly improved her condition but resulted in a speech problem (Tr. 242-49).

---

[1] Dystonia, musculorum deformans, a genetic, environmental or idiopathic disorder, usually beginning in childhood or adolescence, marked by muscular contractions that distort the spine, limbs, hips, and sometimes the cranial-innervated muscles. The abnormal movements are increased by excitement and, at least initially, abolished by sleep. The musculature is hypertonic when in action, hypotonic when at rest. Hereditary forms usually begin with involuntary posturing of the foot or hand (autosomal recessive form), both forms may progress to produce contortions of the entire body. Steadman Medical Dictionary, 26th Ed., p. 536 (1995).

Plaintiff graduated high school and earned a Bachelor's degree in Biology. She has past relevant work experience ("PRW") from 1978 to 1983 as a quality control worker. Based upon the plaintiff's disability application and the hearing testimony, the ALJ found her PRW had entailed a light or greater level of exertion (Tr. 92, 213-214).[2]

The plaintiff has presented no objective medical evidence of medical treatment for the dystonia symptoms from June 1983 to June 1989. Recent medical reports show that plaintiff's symptoms became more apparent in 1990 and have required more frequent treatment after 1992.[3] The plaintiff received medical care from family physician Jonathan Jaffe, M.D. since 1979. Initially, Dr. Jaffe conducted a prenuptial examination and found that plaintiff's speech varied from normal to poor and questioned whether it might be related to anxiety (Tr. 257). In 1981, plaintiff reported an ache in the left knee for a month and she

---

[2] Plaintiff testified she had a speech problem since 1988 or 1989 when she worked part time in her husband's business; her duties included bookkeeping, making bank deposits, preparing and issuing checks to pay expenses, and opening the mail (Tr. 166-67, 173). The ALJ did not consider this substantial gainful activity, but observed that it suggested a level of functioning that was inconsistent with total disability (Tr. 136-37).

[3] In a letter dated January 24, 1996, Sergio Arambulo, M.D. opined "She was a patient of mine from 1986 when she was pregnant for her first baby until her check-up in April 1990 . . . She had difficulty walking and my nurse had to help her during my examinations. Her legs had to be held in position by my nurse. Mrs. Ferland also had difficulty talking but she tried her best to communicate with me. I believe that it is extremely difficult for her to perform any kind of work. She probably would be more of a liability in a place of work." (Tr. 84).

4

took no medication.  The doctor noted it was non-tender and minimal edema at the kneecap and advised no particular treatment (Tr. 269-70).  In December 1981, Dr. Jaffe reported he had treated plaintiff since 1979 and her dystonia condition was stable, and added,

> I see no reason why she would not be employed by the phone company.  Diane's medical condition does not affect her ability to perform many sorts of tasks effectively.

(Tr. 282).

Dr. Jaffe's office notes between 1979 to April 1983 concerned gynecological exams and birth control advice; there was no evidence of treatment for dystonia symptoms (Tr. 258-64).[4]  In May 1982, Dr. Jaffe referred the plaintiff to Dr. James Dalyrymple for a neurological examination.

Dr. Dalyrymple noted that after her childhood surgeries, the plaintiff's condition had been stable and her past medical history was benign.  Dr. Dalyrymple found that when the plaintiff was relaxed, her speech was quite normal, and her mood was excellent, as was her attention span and sense of humor.  Cranial nerves V through XII were normal except for mild difficulty with rapid tongue movements.  On motor examination, her tone was

---

[4]  In January 1982, Dr. Jaffe reported that plaintiff took no medication, although it had been advised, and her speech and movement were impaired, especially when anxious (Tr. 283).  Dr. Jaffe was willing to support plaintiff in an attempt at work which ultimately failed (Tr. 282).

5

normal, she had no resting spontaneous movements and strength testing revealed no evidence of weakness in all four extremities (Tr. 291). Dr. Dalyrymple opined that plaintiff had an "excellent prognosis" to remain at this good functional level with normal intelligence and apparently excellent social adjustment (Tr. 292).

There was no medical evidence of trauma or any medical treatment at the time plaintiff alleged an onset of disability (Tr. 265). In April 1983, Dr. Jaffe re-checked her IUD device and reported the "patient has no complaint." In her disability report, plaintiff stated she left her job in June 1983 due to transportation problems (Tr. 209). The record was silent until September 1994 when her treating physician performed a gynecological exam and he reported no other abnormality (Tr. 265).

In February 1985, plaintiff returned to Dr. Jaffe after she reported a rash over the neck and trunk. Plaintiff told Dr. Jaffe that she had taken no prescribed medication, but noted she had a strawberry daiquiri. Soon after taking Benadryl, the symptoms dissipated (Tr. 266-67).

The plaintiff presented no evidence of medical care for any condition for nearly five years from July 1985 to April 1990. By then, plaintiff had been married and delivered a child. The

plaintiff took no medication and her right leg had spasms. Her treating physician's neurological exam was negative except for dystonia, and speech was affected "intermittently" (Tr. 269-70). In April 1990, plaintiff underwent a Holter test and echocardiagram at her request because she reported an irregular heart beat; the results showed normal sinus rhythm, non specific ST, T wave changes and a normal echocardiagram (Tr. 294-96).

In September 1992, neurologist Robert Thies, M.D., evaluated the plaintiff at the request of her treating physician, Dr. Jaffe. Dr. Thies noted her condition was stable for several years, and recently, she noticed more symptoms in her right arm and right leg. Otherwise, her medical history had been unremarkable. In examination, Dr. Thies found she was alert and pleasant, her speech was strained and dysarthric;[5] her language and understanding appeared excellent. There was twisting dystonic movement in her extremities, especially on the right side. Her gait was mildly staggering but she moved without any assistance (Tr. 298-99). A CT scan of the brain showed the results of previous surgery, but otherwise it was unremarkable (Tr. 297). In October 1992, plaintiff noted her symptoms improved with Artane medication[6] and the tightness in the left

_____

[5] Disarthric - characterized or pertaining to disarthria, which is an imperfect articulation of speech due to disturbances of muscular control. Dorland's Illustrated Medical Dictionary, 26th Edition (1996), p. 514.

[6] Artane is indicated as an adjunct in treatment of Parkinsonism. Physician's Desk Reference, 49th Ed., p. 1251

7

leg and her speech improved (Tr. 300). Plaintiff kept follow-up appointments with Dr. Thies in November 1992 and January and May 1993. Dr. Thies noted that she felt less dystonic and, while her voice was strained, she conversed more easily with medication. The plaintiff said she had a "fair" amount of difficulty in the late evening (Tr. 301-03).

In October 1993, plaintiff saw Dr. Jaffe for a swollen great left toe. She was given medication and told to elevate her foot for ten days (Tr. 270-71). Laboratory tests and an EKG were essentially normal (Tr. 277-79). In November 1993, Dr. Thies noted that medication continued to help plaintiff's gait and lower extremity spasticity to some degree (Tr. 304). Dr. Thies' next report in January 1994 indicated that a small change in her medication was quite effective in treating her symptoms and offered some control over symptoms; reflexes were brisk and dystonic posturing was more pronounced on the right side (Tr. 305).

In late 1994, after review of the records, Dr. Thies opined that plaintiff was totally disabled since 1982, a period of ten years before he began seeing her (Tr. 309). In early 1995, he repeated his opinion regarding disability and commented, if anyone deserved consideration and assistance, it was the plaintiff (Tr. 310).

(1995).

8

A consulting evaluation was conducted by a state Disability Determination Service physician in December 1994, Burton A. Nault, M.D. (Tr. 190-98). After his review of all the medical evidence, Dr. Nault opined the plaintiff could occasionally lift up to 20 pounds, frequently lift and carry up to 10 pounds, stand about 6 hours in an 8 hour day, sit up to 6 hours in an 8 hour day, and she retained an unlimited ability to push/pull (Tr. 191). Dr. Nault assessed her postural limitations for the performance of work, indicating she would occasionally be limited in balancing, climbing, stooping, kneeling, crouching and crawling, but there were no other limitations (Tr. 192-95). Dr. Nault commented that no significant reductions in plaintiff's capacity were identified until well after her date last insured ("DLI")(June 30, 1989). Dr. Nault noted that plaintiff had a significant impairment due to dystonia, but a Listing-Level impairment was not identified from the alleged onset date, June 1983 through her date of last insured status, during which period she realized a capacity to perform light work (Tr. 196).

In March 1995, in a summary letter to the agency, Dr. Jaffe recounted his treatment of the plaintiff from 1979. In his opinion, the plaintiff suffered from her condition since approximately 1985. Dr. Jaffe stated in his opinion, she was unable to do any job prior to 1989, and he considered her disabled since June 1989 (Tr. 286-87, 311-12).

9

## Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary [now, the "Commissioner"], with or without remanding the cause for a rehearing." Factual findings of the Commissioner are conclusive if supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); Irlanda Ortiz v. Secretary of Health and Human Services, 955 F.2d 765, 769 (1st Cir. 1991).[7]

In making factual findings, the Commissioner must weigh and resolve conflicts in the evidence. Burgos Lopez v. Secretary of Health & Human Services, 747 F.2d 37, 40 (1st Cir. 1984) (citing Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982)). It is "the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Commissioner] not the courts." Ortiz, 955 F.2d at 769. Accordingly, the court will give deference to the ALJ's credibility determinations, particularly where those determinations are supported by specific findings. Frustaglia v.

---

[7] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). It is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620 (1966).

10

Secretary of Health & Human Services, 829 F.2d 192, 195 (1st Cir. 1987) (citing Da Rosa v. Secretary of Health and Human Services, 803 F.2d 24, 26 (1st Cir. 1986)).

An individual seeking Social Security disability benefits is disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). The Act places a heavy initial burden on the plaintiff to establish the existence of a disabling impairment. Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987); Santiago v. Secretary of Health and Human Services, 944 F.2d 1, 5 (1st Cir. 1991). To satisfy that burden, the plaintiff must prove that her impairment prevents her from performing her former type of work. Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985) (citing Goodermote v. Secretary of Health and Human Services, 690 F.2d 5, 7 (1st Cir. 1982)). Nevertheless, the plaintiff is not required to establish a doubt-free claim. The initial burden is satisfied by the usual civil standard: a "preponderance of the evidence." See Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982). In assessing a disability claim, the Commissioner considers objective and subjective factors, including: (1) objective medical facts; (2) the plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or

11

other witnesses; and (3) the plaintiff's educational background, age, and work experience.  See, e.g., Avery v. Secretary of Health and Human Services, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote, 690 F.2d at 6.

Once the plaintiff has shown an inability to perform her previous work, the burden shifts to the Commissioner to show that there are other jobs in the national economy that she can perform.  Vazquez v. Secretary of Health and Human Services, 683 F.2d 1, 2 (1st Cir. 1982).  If the Commissioner shows the existence of other jobs which the plaintiff can perform, then the overall burden remains with the plaintiff.  Hernandez v. Weinberger, 493 F.2d 1120, 1123 (1st Cir. 1974); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

When determining whether a plaintiff is disabled, the ALJ is required to make the following five inquiries:

(1)  whether the plaintiff is engaged in substantial gainful activity;

(2)  whether the plaintiff has a severe impairment;

(3)  whether the impairment meets or equals a listed impairment;

(4)  whether the impairment prevents the plaintiff from performing past relevant work; and

(5)  whether the impairment prevents the plaintiff from doing any other work.

20 C.F.R. § 404.1520.  Ultimately, a plaintiff is disabled only if her:

> physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A).

With those principles in mind, the court reviews plaintiff's motion to reverse the decision of the Commissioner.

## Discussion

A.   Background.

In concluding that Mrs. Ferland was not disabled within the meaning of the Act, the ALJ employed the mandatory five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520. At step 3 of the analysis, the ALJ concluded that plaintiff "has severe dystonia musculorum deformans, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P Regulations no. 4." (Tr. 137). The ALJ then concluded that plaintiff had the residual functional capacity ("RFC") to perform the physical exertion requirements of sedentary work (Tr. 138). He also concluded that plaintiff did not suffer from any nonexertional (e.g., speech, cognitive, etc.) limitations (Tr. 138).

At step 4 of the analysis, the ALJ concluded that plaintiff was unable to return to her past relevant work as a quality control worker, a position requiring work at a light (or greater) level of exertion. Accordingly, the burden then shifted to the Commissioner to demonstrate that there were other jobs in the national economy which, in light of her age, educational training, relevant work experience, and RFC, plaintiff could perform. Applying those principles, the ALJ concluded that "[plaintiff's] vocational factors coincide with the Medical-Vocational Guidelines at Rules 201.25 and 201.26, Appendix 2, to Subpart P, which regardless of transferability of skills, both dictate a finding that [the plaintiff] is not disabled." (Tr. 137).

B.    Social Security Ruling 83-20 and Use of a Medical Advisor.

Plaintiff asserts that the ALJ's ultimate conclusion that she was not disabled prior to her date last insured is flawed for several reasons. Most of her arguments remain undeveloped (despite having been afforded the opportunity to file a supplemental memorandum for that very purpose) so are not amenable to serious review and appear to lack merit. One argument, however, does warrant discussion. Because plaintiff has at least quoted the provisions of Social Security Ruling 83-20 (unfortunately, without discussing how those provisions might apply to this case), one might reasonably infer that plaintiff has implicitly asserted that the ALJ erred when he determined,

14

without the benefit of a medical advisor, that the onset of her conceded disability did not occur prior to her date last insured. The Commissioner has assumed as much, and asserts that the services of a medical advisor were not necessary.

The relevant portion of Social Security Ruling 83-20 provides:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomology of the disease process.
>
> * * *
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

Social Security Ruling 83-20 (1983).

Here, the ALJ recognized that while there is a dearth of medical evidence to support the conclusion that plaintiff was disabled prior to her date last insured, plaintiff does suffer

15

from a progressive disease, and more recent medical records certainly suggest that she is now totally disabled.

> In summary, the evidence of record shows a history of difficulties with arm and leg movement attributable to the claimant's diagnosis of dystonia. Prior to her alleged onset of disability, the claimant underwent two surgeries with resulting long term stability in her condition, but with residual speech problems caused by the operation. While there is no documentation in the record of objective medical evidence [supporting a conclusion of disability] for the period, June 3, 1983 through June 30, 1989, more recent medical records have recorded increasing symptoms beginning as early as 1990, necessitating initiation of regular treatment by April 1992. The claimant's condition is presently controlled to some degree with prescription medication and regular monitoring. Despite such efforts, the claimant's condition continues to decrease. Although progressive, the claimant's treating physicians have suggested that the claimant's dystonia had been disabling years prior to June 1989.

(Tr. 134). However, the ALJ found that plaintiff's treating physicians' retrospective diagnoses of disability were not adequately supported by objective medical records and, therefore, he discounted them. He did not, however, enlist the services of a medical advisor to assist him in inferring the onset date of plaintiff's disability.

The Commissioner asserts that the ALJ was not required to call on the services of a medical advisor. Specifically, the Commissioner claims that, "The ALJ carefully reviewed the evidence and testimony and determined that no legitimate medical basis supported an inference of disability prior to the expiration of [plaintiff's] insured status; therefore, no medical

16

advisor was required." Commissioner's supplemental memorandum (document no. 10) at 6. The Commissioner seems to suggest that because plaintiff failed to demonstrate that she was disabled within the meaning of the Act prior to her date last insured, the provisions of SSR 83-20 do not apply. Id., at 6-7 n.2. At least one court of appeals has, however, rejected that argument. See Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997) ("The Commissioner argues that SSR 83-20 applies only for the limited purpose of determining the precise date of onset when the ALJ has already found that a claimant had established her disability and her entitlement to benefits. According to the Commissioner, the ALJ did not need a medical advisor to determine the onset of that disability in this case, because the ALJ determined that [plaintiff] wasn't disabled [prior to her date last insured]. We cannot agree with the Commissioner's construction of SSR 83-20.") (emphasis supplied).

Notwithstanding the Commissioner's assertions to the contrary, the particular facts in this case suggest that the ALJ should have employed the services of a medical advisor to assist in determining whether plaintiff was disabled prior to her date last insured. First, the medical evidence of record is sparse and arguably ambiguous with regard to the severity of plaintiff's disability in the years and months immediately prior to her date last insured. Of course, the dearth of medical records could reflect the fact that plaintiff's condition was not sufficiently

17

serious or disabling to warrant any medical attention. But, in general, it is illogical to presume that the absence of evidence is itself evidence of absence (of the disability). Here, there is evidence to suggest that the sparse medical record trail is the product of plaintiff's acute understanding that she suffers from a debilitating and degenerative disease (for which there is little, if any, truly effective treatment) and her overwhelming desire to accept the discomfort associated with her condition without complaining and while trying to maintain as normal a life as possible. At a minimum, that is certainly the view of her husband and her treating physicians. See, e.g., Opinion letter of Dr. Thies (Tr. 310) ("It was through sheer force of will that she has attempted to normalize her life and that of her family. I have many patients in my own practice who have half the neurologic difficulty that she has, and whom I would nevertheless consider permanently disabled. While my first contact with Diane was in 1992, that contact and all available historical information suggests that she was already totally disabled by her illness more than 10 years before."); Opinion letter of Dr. Jaffe (Tr. 311-12) ("Mrs. Ferland has suffered since I first knew her from a severe case of Dystonia Musculorum Deformans. . . . I can state with reasonable medical certainty that Diane Ferland was unable to do any job within the economy prior to 1989. She has done any possible thing in her power to prevent being disabled. However, her disease process has progressed to the point where she is disabled at present and certainly has been disabled since

18

June 1989."). Additionally, both plaintiff and her husband testified that her condition was as severe in June of 1989 as it is today, but that she simply sought treatment for it beginning in 1990 (Tr. 166, 176, 184-45).

Because the record medical evidence is at best ambiguous and because plaintiff's treating physicians have both offered expert opinions that she was totally disabled well before her date last insured, the ALJ should at least have called a medical advisor to assist him in inferring the onset date of plaintiff's disability as fairly and accurately as possible. See Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995) ("[I]f the evidence of onset is ambiguous, the ALJ must procure the assistance of a medical advisor in order to render the informed judgment that the Ruling requires."); Spellman v. Shalala, 1 F.3d 357, 362 (5th Cir. 1993) ("[I]n cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the [Commissioner] must infer the onset date, SSR 83-20 requires that the inference be based on an informed judgment. The [Commissioner] cannot make such an inference without the assistance of a medical advisor."); Delorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical

19

advisor and to obtain all evidence which is available to make the determination.").

That the ALJ should have consulted a medical advisor is also supported by a recent (albeit unpublished) opinion of the Court of Appeals for the First Circuit. See May v. Commissioner, 1997 WL 616196 (1st Cir. October 7, 1997) ("[W]e find that the evidence regarding the date on which claimant's mental impairment became severe is ambiguous. Therefore, Social Security Ruling 83-20 required the ALJ to consult a medical advisor. Neither the absence of medical treatment records from the relevant period nor the retrospective nature of [the treating source's] opinion justified the ALJ's finding that the treating source's report was too speculative a basis for establishing a severe impairment."). Finally, requiring the ALJ to call upon the assistance of a medical advisor in cases such as this is consistent with prior rulings from this court. For example, in Field v. Shalala, No. 93-289-B (D.N.H. August 30, 1994), this court (Barbadoro, J.) held that:

> While [SSR 83-20] emphasizes the importance of objective medical evidence, it acknowledges that oftentimes the claimant's first relevant medical record is his or her diagnosis. In these situations, the Ruling precludes the ALJ from simply disregarding or discrediting the claimant's allegations. Instead, where the nature of a claimant's impairment indicates that it might have become disabling prior to its diagnosis date, the ALJ must determine the date on which "it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in" substantial gainful activity. . . . Where the onset date must be

20

inferred from "the medical and other evidence describing the history and symptomology of the disease process," the ALJ is required to retain a medical advisor's assistance.

Id., slip op. at 6 (citations omitted). Although plaintiff was well aware of her condition prior to her date last insured (i.e., her "diagnosis date" was sometime in her early childhood), the date when her condition became sufficiently disabling to meet the requirements of the Act remains undetermined. In light of all of the circumstances of this case (e.g., plaintiff's testimony regarding the onset of her disability, the expert opinion evidence of retrospective diagnoses, the sparse and ambiguous medical records predating her date last insured, the testimony of those who know her and who state that she was unwilling to seek medical treatment or disability status when she probably could have, thereby causing the sparse medical record, etc.), a reasonable and rational decision relative to onset could not be made without the benefit of expert medical advice.

## Conclusion

To be sure, this is a close case, particularly in light of the relative paucity of medical records prior to plaintiff's date last insured. And, while the ALJ's decision is, in all other respects, thorough and well-reasoned, the failure to consult with a medical advisor with a view toward inferring a reasonable onset date of plaintiff's disability counsels in favor of remanding this matter for further proceedings. Accordingly, plaintiff's

21

motion to reverse the decision of the Commissioner (document no. 5) is granted and the Commissioner's motion to affirm the decision of the Commissioner (document no. 6) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is remanded to the ALJ for further proceedings consistent with this opinion.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

July 23, 1998

cc:  David L. Broderick, Esq.
     Robert E. Raiche, Sr., Esq.