2014 DNH 100

**Richard Arthur WILSON**

v.

**Carolyn W. COLVIN, Acting Commissioner, Social Security Administration.**

**Civil No. 13–cv–285–PB.**

United States District Court,
D. New Hampshire.

Signed May 6, 2014.

Raymond J. Kelly, Manchester, NH, for Richard Arthur Wilson.

Robert J. Rabuck, U.S. Attorney's Office, Concord, NH, for Carolyn W. Colvin, Acting Commissioner, Social Security Administration.

### MEMORANDUM AND ORDER

PAUL BARBADORO, District Judge.

Richard Arthur Wilson seeks judicial review of a ruling by the Commissioner of the Social Security Administration ("SSA") denying his application for Disability Insurance Benefits ("DIB"). Wilson claims that the Administrative Law Judge ("ALJ") erred in failing to call a medical advisor to assist him in determining the onset date of his claimed disability.

For the reasons set forth below, I vacate the decision of the Commissioner and remand for further administrative proceedings.

## I.  BACKGROUND [1]

### A.  Procedural History

Wilson applied for DIB on May 14, 2010,[2] claiming that he became disabled on July 1, 1994 due to depression, post-traumatic stress disorder (PTSD), social anxiety disorder, obsessive compulsive disorder (OCD), and generalized anxiety disorder.[3]  Tr. at 28.  He was fifty-six years old at the time of his application.  The SSA determined that Wilson's DLI was December 31, 1999.  After reviewing his application, it denied his DIB claim on September 23, 2010.  *Id.*  Wilson requested a hearing before an ALJ, which was held on December 13, 2011.  He appeared by video and was represented by an attorney.  Tr. at 23.  On December 23, 2011, the ALJ issued a decision finding that Wilson had not been disabled prior to his DLI. The Appeals Council denied Wilson's request for review on April 4, 2013.  Accordingly, the ALJ's decision is the final decision of the Commissioner.

### B.  Relevant Medical History

#### 1.  October 2005–October 2009

Wilson's medical record includes notes from seven hospital visits prior to his first report of a mental impairment.  On October 26, 2005, Wilson visited the emergency room at Dartmouth Hitchcock Medical Center complaining of right shoulder pain after a fall.  Tr. at 291.  He was diagnosed with a right mid-shaft clavicle fracture and a right ankle sprain.  Treatment notes from this visit and four follow-up appointments report that Wilson appeared healthy apart from his injuries and was alert, cooperative, ambulatory, neurologically intact, and in no acute distress.

Wilson next sought medical care three years later.  On October 13, 2008, he visited his primary care physician, Dr. Ellen Eisenberg, M.D., complaining of various chronic and acute medical problems.  He stated that his last physical exam had occurred when he was in the service.[4]  Tr. at 275.  Wilson subsequently visited Physician Assistant James Gosselin on October 15, 2009 with complaints of chronic low back pain.  Dr. Eisenberg's and Mr. Gosselin's notes from these visits indicate that Wilson was healthy and presented with a stable mood, no depression, and no psychological symptoms.

#### 2.  November 2009—June 2011

After Wilson first reported psychological difficulties to his medical providers in November 2009, multiple sources documented opinions regarding his impairments. These sources include James Gosselin; psychiatrists Christine Finn, M.D., and Douglas Noordsy, M.D.; and psychologists Claudia Zayfert, Ph.D., Leslie Bryant, Ph.D, and Michael Schneider, Psy.D. Wilson also provided evidence of his own functional limitations.

---

1.  The background facts are presented in the parties' Joint Statement of Material Facts (Doc. No. 15) and are summarized here.  I also rely on the Administrative Transcript (Doc. No. 7), citations to which are indicated by "Tr.".

2.  Wilson previously applied and was rejected for Supplemental Security Income ("SSI") because his assets exceeded the relevant threshold for those benefits.  Tr. at 29.

3.  Wilson initially alleged that he became disabled on July 1, 1993, but subsequently amended the alleged disability onset date to July 1, 1994.

4.  Wilson reported to the SSA that he had worked as a civilian electrician from 1976 to 1994.  Tr. at 130.  His record also reports a history of earnings between 1967 and 1975.  Tr. at 81.  Assuming that the "service" to which Wilson refers is military in nature, it presumably occurred prior to 1976.

### a. Physician Assistant Gosselin

On November 30, 2009, Wilson reported to Mr. Gosselin that he experienced difficulty being around people and had struggled with anxiety all of his life. He recounted that it had become such a problem that he eventually quit his job in 1994. Wilson stated that he had recently grown sadder, felt worthless, had lost interest in activities that he previously enjoyed, and had racing thoughts that he dealt with by falling asleep on his couch to old sitcoms. After noting that Wilson was alert and oriented with respect to place, time, and other people, Mr. Gosselin diagnosed Wilson with depression and anxiety, prescribed Lexapro,[5] and referred Wilson to Dr. Finn. Tr. at 265.

Wilson returned to Mr. Gosselin on at least three occasions over the next fourteen months. During these visits, he noted that he was able to walk his dog, split firewood, and take care of his granddaughter three days a week. On one occasion, Mr. Gosselin noted that Wilson was a "healthy male with stable depression and anxiety." On at least one occasion, Wilson showed no symptoms of depression and was not in acute distress. Mr. Gosselin noted Wilson's history of anxiety and depression, but was unable to determine a particular onset date for his impairments.

On June 27, 2011, Mr. Gosselin and Dr. Eisenberg together opined that Wilson was markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting, as well as in his ability to interact appropriately with the public, with supervisors, and with coworkers. As an example, they noted that Wilson required medication before leaving his house and had difficulty going out to pick up a pizza.

### b. Dr. Finn

Dr. Finn examined Wilson on two occasions in January 2010. During these visits, Wilson complained of lifelong anxiety and difficulty managing social situations. He reported that he feared embarrassing himself and drawing attention to himself, had thoughts that everyone was looking at him, had difficulty being in crowds, had a tendency to rethink things he had said, had anxious ruminations that interfered with his sleep, suffered from headaches and sweaty palms, and checked to see that his garage door was closed up to twenty times a day. Wilson stated that he was experiencing increasing anxiety due to an upcoming court appearance and the prospect of participating in a social anxiety group. At his first appointment, he noted that Lexapro took the edge off his depression, but residual symptoms remained. At the next appointment, Wilson denied any symptoms of depression and reported an improvement in his mood.

Dr. Finn observed that Wilson was stressed with an anxious mood and affect. She noted that he was alert and oriented, with good judgment, good insight, a linear and goal-directed thought process, an appropriate fund of knowledge, and intact attention and memory. Dr. Finn concluded that Wilson's symptoms were consistent with dysthymia,[6] but he was "not greatly functionally impaired by it." Tr. at 262. She also opined that Wilson appeared to have generalized anxiety disorder, social phobia, specific phobia, and obsessive com-

---

5. Lexapro is an antidepressant. *Dorland's Illustrated Medical Dictionary* 654, 1047 (31st ed.2007).

6. Dysthymia involves a "[d]epressed mood for most of the day, for more days than not...." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 168 (5th ed.2013) [hereinafter *DSM–V]*.

pulsive disorder (OCD).[7] She assigned Wilson a Global Assessment of Functioning ("GAF") score of sixty.[8] Dr. Finn then referred Wilson to Drs. Noordsy and Zayfert for further treatment. Tr. at 251, 257.

### c. Dr. Noordsy

Wilson visited Dr. Noordsy monthly between January and June 2010 and quarterly for the remainder of the year. He informed Dr. Noordsy that he had been sexually abused by a family priest at around age ten and had stopped working in 1994 due to persistent anxiety about returning to work the following day. Wilson noted that he had always experienced social discomfort, particularly in situations where he was alone with a man, because he was afraid that someone would make an advance on him. Consequently, all of his friends were women. Wilson reported that he had experienced worsening depression for several years in addition to anxiety and nervousness around strangers.

Although his symptoms had improved since he began taking Lexapro, Wilson nevertheless told Dr. Noordsy that he wished he could have a "cell to stay in where he can be left alone." Wilson informed Dr. Noordsy that he was overwhelmed and anxious when challenged by stressors or changes in routine. He noted that he was fine while at home, enjoyed weekly visits with his parents, and could shop for groceries at IGA or Walmart, but did not visit other stores because of social discomfort. He reported that he did not want to use the buttons on credit card machines because he felt as if everyone in the room was staring at him. Wilson subsequently reported that he only left the house to visit his therapist.

After several sessions with Dr. Noordsy, Wilson informed him that he still had symptoms of anxiety which had improved somewhat. He noted that Lexapro helped him to maintain a generally good mood, but it did not significantly affect his anxi-

---

**7.** Generalized anxiety disorder involves "excessive anxiety and worry (apprehensive expectation) about a number of events or activities." *Id.* at 222. Social phobia, also known as social anxiety disorder, involves "a marked, or intense, fear or anxiety of social situations in which the individual may be scrutinized by others." *Id.* at 203. Specific phobia involves "[m]arked fear or anxiety about a specific object or situation...." *Id.* at 197. Obsessive compulsive disorder involves either "[r]ecurrent and persistent thoughts, urges, or images that are experienced ... as intrusive and unwanted, and that in most individuals cause marked anxiety and distress," or "[r]epetitive behaviors ... or mental acts ... that the individual feels driven to perform in response to an obsession or according to rules that must be applied rigidly," or both. *Id.* at 237.

**8.** A GAF score of fifty-one to sixty indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text rev.2000). In contrast, a score of forty-one to fifty indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A score of sixty-one to seventy indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* The SSA has remarked that the GAF Scale "does not have a direct correlation to the severity requirements in our mental disorders listings," Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50,746, 50,764–65 (Aug. 21, 2000), and the American Psychiatric Association no longer recommends its use due to "its conceptual lack of clarity ... and questionable psychometrics in routine practice." *DSM–V, supra* note 6, at 16.

ety. Wilson also reported that his OCD symptoms had improved and that he had learned to let go of compulsions much more quickly. He reported that he had stopped participating in therapy with Dr. Zayfert in March due to her suggestion that he participate in group therapy and vocational training, which made him anxious and unable to sleep. In contrast, medication combined with psychotherapy with Dr. Bryant had helped ease his depression. During one visit in April, Wilson reported that he had cried the day before, felt more down about losses, and had suicidal thoughts every day without a plan or intent to act on them. In the following months, Wilson reported that he was having no abnormal or psychotic thoughts. Thoughts of suicide returned in September, but without psychotic symptoms. Wilson agreed to follow Dr. Noordsy's advice to continue exercising regularly as a means of managing his anxiety and depression. He also told Dr. Noordsy that he was applying for disability benefits and considering starting his own business.

Dr. Noordsy noted that Wilson showed substantial improvement on Lexapro but opined that psychotherapy was likely to be the most helpful treatment. He prescribed Buspirone[9] to Wilson in March, increased Wilson's dose of Lexapro in May, and prescribed Clonazepam[10] in June for extreme anxiety before increasing the dosage of that drug in September. Tr.

at 232. Wilson reported that he felt much better as a result of the increased dosage of Lexapro and had not had an "episode" in more than two weeks.

Dr. Noordsy noted on several occasions that Wilson was oriented times four;[11] had a linear, logical, coherent, and goal-directed thought process; normal memory; fair to good judgment, attention, and concentration; intact, logical, and coherent associations; calm or full affect with some tension; an anxious and sad mood that showed occasional improvement; and suicidal thoughts without psychotic symptoms. He reported that Wilson was preoccupied with public appearances. Dr. Noordsy diagnosed Wilson with social anxiety disorder, major depression,[12] OCD, and possibly a dependent personality disorder.[13] He assigned Wilson a current GAF score of fifty and determined that his highest GAF score in the past year was seventy,[14] indicating significant fluctuation in Wilson's symptoms over the course of his treatment. Dr. Noordsy concluded that Wilson had experienced lifelong social anxiety that likely preceded the sexual abuse at age ten.

### d. Dr. Zayfert

Wilson visited Dr. Zayfert on at least six occasions between January and March of 2010 for evaluation and treatment for depression, social anxiety, and OCD. He in-

---

9. Buspirone is "an antianxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms...." *Dorland's, supra* note 5, at 269.

10. Clonazepam is used "as an antipanic agent in the treatment of panic disorders...." *Id.* at 379.

11. Orientation times four refers to recognition of one's temporal, spatial, personal, and situational environment. *See, e.g., Abad v. Astrue,* No. 2:11–CV–00629, 2012 WL 3853098, at *5 (S.D.W.Va. Sept. 5, 2012).

12. Major depressive disorder involves "either depressed mood or the loss of interest or pleasure in nearly all activities...." DSM–V, supra note 6, at 163.

13. A dependent personality disorder "is a pattern of submissive and clinging behavior related to an excessive need to be taken care of." *Id.* at 645.

14. See *supra* note 8 for a narrative description of these scores.

formed Dr. Zayfert that he had been depressed for five years, but the depression had worsened in October 2009 due to family difficulties. He noted that Lexapro helped mitigate his depressive symptoms. Wilson reported that he had always been anxious around people, had avoided school, had few friends, feared being the center of attention, experienced anxiety in daily social situations, and was unable to work due to his anxiety, which also caused him severe distress. Wilson further noted that he checked the locks in his home eight to twenty times per day, filled in grooves in the dirt created by his granddaughter's bike, always parked his car in the same place, and kept his wood pile neat. He explained that this behavior did not interfere much with his daily functioning, primarily because he did very little. Wilson told Dr. Zayfert that he was surprised to learn that his wife, whom he relied on for financial support, had filed for divorce. He added that his family had suggested that he apply for disability benefits. Wilson voiced an interest in volunteering as a means of learning to cope with being around people.

Dr. Zayfert noted that Wilson was cooperative and fidgety with rapid speech, alert and attentive concentration, normal memory, a logical and coherent thought process, good judgment, fair insight, intact associations, a broad affect, and a euthymic mood. She reported that Wilson became less avoidant in later sessions. She also noted that he began experiencing suicidal thoughts. Dr. Zayfert diagnosed Wilson with social phobia and major depressive disorder in partial remission. She concluded that Wilson's anxiety had been present most of his life and had contributed to significant impairment in his social and occupational functioning, including leading to his "retirement" from work. Dr. Zayfert opined that Wilson suffered from significant anxiety when he believed that attention was focused upon him. She determined that Wilson's current and highest GAF score in the past year was fifty. According to Dr. Zayfert, Wilson was most likely to benefit from group treatment for social anxiety, though he remained unclear about his treatment goals and motivation for change. She specifically noted that Wilson "voiced minimal motivation to engage in treatment for social anxiety" and that his major life stressors impeded his readiness to engage in active treatment.

#### e. Dr. Bryant

Dr. Bryant provided individual psychotherapy to Wilson once or twice a week between April 2010 and August 2011. On May 12, 2011, she wrote a letter to Wilson's attorney noting her impressions of Wilson's impairments and functionality. According to Dr. Bryant's letter, Wilson first realized he needed help for mental health issues when his ex-wife unexpectedly announced that she was seeking a divorce. Up to that point, Wilson had "avoided medical or mental health treatment at all costs" due to his extreme social discomfort at the thought of being examined by doctors. Dr. Bryant opined that Wilson suffered from PTSD [15] stemming from sexual abuse, superimposed on debilitating social anxiety that had preceded the trauma. She noted that it was very difficult for Wilson to leave home and that he required a tranquilizer to go to the grocery store. According to Dr. Bryant, Wilson's symptoms were only marginally improved

---

15. PTSD involves "[e]xposure to actual or threatened death, serious injury, or sexual violence" resulting in certain characteristic symptoms that create "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *DSM–V, supra* note 6, at 271–72.

by medication. She did not believe that he was capable of providing for himself.

On June 1, 2011, Dr. Bryant reported that Wilson had extreme limitations in his ability to interact appropriately with supervisors and coworkers and to respond appropriately to usual work situations and changes in a routine work setting, moderate limitations in his ability to interact with the public, and no limitations in his ability to understand, remember, and carry out instructions. She noted that Wilson rarely left home due to his severe social anxiety and PTSD. Dr. Bryant reported that these limitations were first present in October 1994 and currently prevented him from becoming employed.

On August 30, 2010, Dr. Bryant diagnosed Wilson with PTSD and generalized social phobia. She noted that Wilson was unable to function in social situations, avoided stress by remaining isolated at home, and had avoided medical treatment for years due to his social anxiety and PTSD. She opined that these limitations had been present since 1993.

### f. Dr. Schneider

On September 23, 2010, state agency medical consultant Dr. Michael Schneider reviewed Wilson's complete medical record and concluded that it contained no medical evidence from Wilson's alleged onset date to his DLI.[16] Noting that Wilson's mental health treatment began in 2010, Dr. Schneider stated that he was unable to substantiate the existence of a severe impairment prior to Wilson's DLI.

### g. Wilson's Function Reports [17]

In two function reports dated August 16, 2010 and January 13, 2011, Wilson reported that he lived alone on his sixteen-acre property. He noted that he frequently walked his dog, rode his bicycle on a rail trail, did housework and laundry, prepared frozen dinners, did small chores outside, checked for mail, and watched television. He stated that he had a hard time falling asleep, but was able to do so on the sofa in front of the television. Before his ex-wife left him, she prepared all his meals and did most of the housework. She continued to help him with chores, appointments, and grocery shopping once a month. Wilson reported that if he had to go to the grocery store alone, he would choose to go at a time when there were few people in the store. Other than food, he purchased everything he needed on the internet. The only times that Wilson left his land were to ride on the rail trail, go to therapy, and shop with his ex-wife.

Wilson recounted that despite difficulties, he had been able to be around other people and work in the past. He used to bicycle with his sons when they were younger, but he is no longer in contact with them. Wilson also noted that he used to go boating with his ex-wife, but he sold the boat because boating required contact with people. He stated that he became extremely stressed when he talked to anyone and by the mid–1990s had discontinued all social relationships except for with his ex-wife. He had no friends and had built his house in the middle of his property so that he would not have to make friends. He dreaded any upcoming inter-

---

**16.** Although Wilson alleges that he became disabled on July 1, 1994, *see supra* note 3, Dr. Schneider limited his assessment to the period between December 31, 1994 and December 31, 1999. Tr. at 172. The discrepancy is immaterial, as there is no evidence in the record from the latter half of 1994 that would have changed Dr. Schneider's conclusions.

**17.** These reports include entries written by Wilson along with several written by his attorney on his behalf.

actions with people and continued to have dreams that provoked anxiety about work. Wilson complained of problems concentrating and getting along with others. He reported extreme fear when he was around other people, especially if he was the center of attention. Wilson stated that he avoided men, particularly in confined areas such as cars, because of his fear of being molested.

In a Disability Report dated October 20, 2010, Wilson's attorney stated that Wilson avoided all public interaction, did not go to restaurants or movies, and isolated himself in his home to avoid seeing his neighbors.

## C. *Administrative Hearing—December 13, 2011*

At the hearing, Wilson testified that he had been sexually molested as a child and had only realized its impact after beginning psychiatric treatment. Tr. at 348. He noted that he did not like being the center of attention and felt extremely uncomfortable around other people, especially men. He first realized he had anxiety after telling a doctor of the frequent episodes in which he felt extremely nervous and uncomfortable, with chest pain and sweaty hands.

Wilson testified that he stopped working in July 1994 because of anxiety. Tr. at 342–43. He had cut back his workweek to four days between 1992 and 1994, but still spent every weekend worrying about returning to work on Monday. Wilson noted that he did not pursue treatment or go to the hospital, even when he was experiencing back pain, because he was too nervous

to see a doctor. He reported that from 1994 to 1999 he did not go to church or visit relatives. He did not attend his son's school events because there were too many people there. Instead, Wilson reported that he preferred to stay at home and use the computer. He noted that his ex-wife did all the shopping in the mid to late 1990s. Later, he occasionally accompanied her on shopping trips.

Wilson reported that he always felt that his neighbors were watching him when he was outside of his home. Consequently, he purchased sixteen acres of property around 2001 and placed his mobile home in the middle of the property, 400 feet from his nearest neighbors, to avoid interacting with them. Tr. at 345, 359.

Although a VE attended the hearing, the ALJ did not solicit her testimony. Tr. at 363.

## D. *The ALJ's Decision*

■ In her decision dated December 23, 2011, the ALJ first found that Wilson's DLI was December 31, 1999. She then proceeded with the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4) to determine whether an individual is disabled. At step one, the ALJ found that Wilson had not engaged in substantial gainful activity from July 1, 1993 [18] through his DLI, December 31, 1999. At step two, the ALJ relied on Social Security Ruling (SSR) 88–3 for the proposition that a claimant bears the burden of proof at step two to prove the existence of a medically determinable impairment,[19] as well as SSR 96–4p for the

---

**18.** Wilson's actual alleged disability onset date is July 1, 1994. *See supra* note 3.

**19.** SSR 88–3 does not exist, but the proposition for which it was cited is undoubtedly correct. *See, e.g., May v. Soc. Sec. Admin. Comm'r,* 125 F.3d 841 (1st Cir.1997) (per curiam) (unpublished table decision) (citing

*Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). Although the claimant bears the burden of proof at this stage of the sequential evaluation process, the ALJ may deny a claim at step two "only where 'medical evidence establishes only a slight abnormality or combination of slight

proposition that a claimant's symptoms are insufficient to establish a medically determinable impairment in the absence of medical signs or laboratory findings.[20] The ALJ subsequently determined that there were no medical signs or laboratory findings prior to Wilson's DLI to substantiate the existence of a medically determinable impairment during that period, and consequently found that Wilson had not been disabled between July 1, 1993 and December 31, 1999.

## II. STANDARD OF REVIEW

■ Under 42 U.S.C. § 405(g), I must review the pleadings and the administrative record and enter a judgment affirming, modifying, or reversing the final decision of the Commissioner. My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir.2000).

■ The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.

1991) (per curiam) (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981)). It is the role of the ALJ, not the court, to resolve conflicts in the evidence. *Id.* The ALJ's findings of fact are accorded deference as long as they are supported by substantial evidence. *Id.* Substantial evidence to support factual findings exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Id.* (quoting *Rodriguez*, 647 F.2d at 222). If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." *Id.* at 770 (citing *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir.1987) (per curiam)).

■ Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999) (per curiam) (citing *Irlanda Ortiz*, 955 F.2d at 769; *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir.1986) (per curiam)).

abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education or work experience were specifically considered' ... [because] the step two severity requirement is intended 'to do no more than screen out groundless claims.' " *Id.* (quoting *Barrientos v. Sec'y of Health & Human Servs.*, 820 F.2d 1, 2 (1st Cir.1987); *McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir.1986); SSR 85–28, 1985 WL 56856, at *3 (Jan. 1, 1985)).

20. *See* SSR 96–4P, 1996 WL 374187, at *2 (July 2, 1996). SSR 96–4P does not discuss the determination of a claimant's disability onset date. The parties debate whether Wilson's providers' observations of his nervousness and other traits can be properly classified as signs (which may be used to establish the existence of a medically determinable im-

pairment) or symptoms (which, on their own, may not). *See id.* at *1 & n. 2 (citing 20 C.F.R. §§ 404.1528–.1529, 416.928–.929) ("[S]ymptoms, such as ... nervousness, are an individual's own perception or description of the impact of his or her ... impairment(s).... However, when any of these manifestations is a[] ... psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom.' "). I need not decide that question because, as discussed below, the ALJ only discussed the providers' opinions as they applied to the insured period and made no findings whatsoever regarding whether there was sufficient evidence to establish a medically determinable impairment at any point after Wilson's DLI.

## III. ANALYSIS

In the present case, uncontradicted medical evidence supports Wilson's contention that the onset of his claimed disability preceded his DLI. The issue presented in this appeal is whether the ALJ was entitled to disregard that evidence and determine that Wilson was not disabled prior to his DLI without first consulting a medical advisor pursuant to SSR 83–20, 1983 WL 31249 (Jan. 1, 1983). Because the ALJ erred in failing to consult a medical advisor, I remand the case for further proceedings consistent with this Memorandum and Order.

### A. SSR 83–20

Wilson contends that the ALJ contravened SSR 83–20 by inferring, without the assistance of a medical advisor, that he was not disabled prior to his DLI.[21] The Ruling notes that for "disabilities of non-traumatic origin,[22] the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." SSR 83–20, 1983 WL 31249, at *2. The "starting point in determining the date of onset of disability is the individual's statement as to when disability began," which "should be used if it is consistent with all the evidence available." Id. at *2–3. The date of work stoppage is also "frequently of great significance in selecting the proper onset date." Id. at *2. These two factors are significant, however, only to the extent that they are "consistent with the severity of the condition(s) shown by the medical evidence," which "serves as the primary element in the onset determination." Id. at *1–2. An ALJ cannot determine an onset date in the absence of medical evidence. Id. Nonetheless,

> [w]ith slowly progressive impairments,[23] it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

Id. at *2.

■ In these circumstances, SSR 83–20 specifies at least three steps that an ALJ may, and in some circumstances must, take to infer an onset date. First, "[i]f there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made."[24] Id. at *3. Second,

---

**21.** Social Security Rulings are binding on ALJs. 20 C.F.R. § 402.35(b)(1); accord McDonald, 795 F.2d at 1125.

**22.** There is no evidence that Wilson was subjected to any trauma after his DLI that might have precipitated his alleged mental impairments.

**23.** The impairments alleged by Wilson fall into this category. See, e.g., Spellman v. Shalala, 1 F.3d 357, 362 (5th Cir.1993) (anxiety and depression); Meyer–Williams v. Comm'r of Soc. Sec., No. 8:09–CV–1954–T–17MAP,

2011 WL 843964, at *4 n. 1 (M.D.Fla. Feb. 17, 2011) (OCD), rep. & rec. adopted sub nom. Myer–Williams v. Comm'r of Soc. Sec., No. 8:09–CIV–1954–T–17, 2011 WL 843972 (M.D.Fla. Mar. 8, 2011); Magnusson v. Astrue, 2009 DNH 054, 23 (PTSD), 2009 WL 995480.

**24.** The ALJ sought additional medical evidence from Dartmouth Hitchcock Medical Center covering the period from 1994 to 1999, but was informed that Wilson had received no treatment there during that period. Tr. at 164–65.

[i]f reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained [with the claimant's consent] from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.[25]

*Id.* Third, if an ALJ lacks "a legitimate medical basis" to identify a particular onset date because the evidence regarding onset is ambiguous, he or she "should call on the services of a medical advisor" to assist in inferring an onset date that is supported by a "[c]onvincing rationale." *Id.; see also May,* 125 F.3d 841 (citing *Bailey v. Chater,* 68 F.3d 75, 79 (4th Cir. 1995); *Spellman,* 1 F.3d at 363; *Morgan v. Sullivan,* 945 F.2d 1079, 1082 (9th Cir. 1991)) ("[T]he evidence regarding the date on which claimant's mental impairment became severe is ambiguous. Therefore, [SSR] 83–20 required the ALJ to consult a medical advisor.").

### B. *Application*

██ The ALJ did not reference SSR 83–20 in her decision. Nor did she attempt to determine whether Wilson is currently disabled. Instead, without consulting a medical advisor, she discounted Wilson's testimony concerning the onset of his disability, refused to credit the uncontradicted medical evidence on the issue, and determined without the assistance of a medical advisor that he was not disabled as of his DLI. The ALJ based this determination on the fact that the

record does not contain any evidence that Wilson had sought contemporaneous treatment for the condition that gave rise to his claimed disability. This was an error of law that requires remand.

SSR 83–20 specifically contemplates the possibility that an onset date may precede any medical treatment. *See* 1983 WL 31249, at *3 ("[I]t may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working."). If the medical evidence from the period after a claimant's DLI could permit a reasonable inference that the claimant became disabled during the insured period, the absence of pre-DLI medical evidence, standing alone, is not a sufficient basis to deny benefits. *See id.; see also Bird v. Comm'r of Soc. Sec. Admin.,* 699 F.3d 337, 341 (4th Cir.2012) (when pre-DLI medical records are lacking, post-DLI evidence may be the "most cogent proof" of pre-DLI disability so long as "the record is not so persuasive as to rule out any linkage"); *Blea v. Barnhart,* 466 F.3d 903, 913–14 (10th Cir.2006) (same); *cf. May,* 125 F.3d 841 (citing *Arnone v. Bowen,* 882 F.2d 34, 39 (2d Cir.1989)) ("[T]he absence of medical treatment records from the [insured] period ... [did not] justif[y] the ALJ's finding that the treating source's report was too speculative a basis for establishing a severe impairment."); *Moret Rivera v. Sec'y of Health and Human Servs.,* 19 F.3d 1427 (1st Cir.1994) (per curiam) (unpublished table decision) ("Medical evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds

---

**25.** The ALJ did not seek Wilson's permission to contact individuals who knew him prior to his DLI. The best source of such information—Wilson's ex-wife—attended the hearing and was acknowledged by the ALJ but was never asked to testify. *See* Tr. at 337.

on the question whether claimant's impairment(s) reached disabling severity *before* claimant's insured status expired."). To be sure, the absence of treatment during the insured period is a factor that the ALJ may consider in making credibility determinations. *See, e.g., Bird,* 699 F.3d at 341 n. 2; *Guranovich v. Astrue,* 465 Fed.Appx. 541, 544 (7th Cir.2012); *Grebenick v. Chater,* 121 F.3d 1193, 1200 (8th Cir.1997). But it cannot obviate the need to call a medical advisor where other medical evidence in the record leaves the onset date ambiguous. *See, e.g., May,* 125 F.3d 841.

The evidence in this case clearly leaves that issue ambiguous. Although there is a gap of five years between Wilson's DLI and his earliest medical records, Drs. Bryant, Finn, Noordsy, and Zayfert—the four mental health specialists who either treated or examined Wilson—all specified that Wilson's mental impairments and concomitant functional limitations existed prior to his DLI. *See* Tr. at 171, 253, 259, 262, 295. The remaining medical sources—Dr. Schneider, a non-examining psychologist; Dr. Eisenberg, an internist; and Mr. Gosselin, a physician assistant specializing in internal medicine—simply stated that they were unable to specify an onset date because Wilson first sought treatment for his mental impairments in 2009. *See* Tr. at 172, 184, 329. That by no means im-

plies that these providers believed that Wilson was not disabled prior to his DLI. *See, e.g., May,* 125 F.3d 841; *Hall v. Astrue,* No. 11–CV–134–JL, 2011 WL 6371875, at *7 (D.N.H. Nov. 29, 2011), *rep. & rec. adopted sub nom. Hall v. U.S. Soc. Sec. Admin., Comm'r,* 2011 WL 6371369 (D.N.H. Dec. 19, 2011); *cf. Biron v. Astrue,* No. 09–40084–FDS, 2010 WL 3221950, at *7 (D.Mass. Aug. 13, 2010) (acceptable medical source expressly concluded that claimant was asymptomatic throughout the insured period). Further, apart from the inference that the ALJ drew from the fact that Wilson did not seek medical treatment for his claimed disability until several years after his DLI, there is no non-medical evidence in the record that conflicts with the mental health specialists' retrospective opinions.[26] *See May,* 125 F.3d 841. An ALJ requires such evidence in a case like this to determine that a claimant's impairments were not severe prior to his or her DLI "in the absence of competing medical opinions." *Id.; accord Bird,* 699 F.3d at 341.

■ The Commissioner nevertheless maintains that a remand is not required because the decision whether to call a medical advisor was completely within the discretion of the ALJ. The Commissioner claims that this is so because SSR 83–20

---

**26.** On the contrary, Wilson's testimony—which neither the medical sources of record nor the ALJ discredited—is consistent with the existence of disabling mental impairments prior to his DLI. *See, e.g.,* Tr. at 343 (chest pain, sweating, nervousness, hiding from others); Tr. at 345 (fear of being looked at); Tr. at 347 (stress when around coworkers and discomfort when within arm's reach of men, including his own sons); Tr. at 348 (sexual abuse as a child); Tr. at 350, 356 (reliance on wife to do household chores and errands); Tr. at 350 (cutting back work hours, constantly worrying about returning to work); Tr. at 351 (avoidance of doctors despite physical ailments); Tr. at 355 (panic attacks); Tr. at 357

(avoiding friends and family); Tr. at 358 (avoiding sons' school functions); Tr. at 361 (excessive drinking after work); Tr. at 363 (interrupted sleep); Tr. at 364 (racing thoughts). Given Wilson's testimony regarding his anxiety around doctors and his fear of being examined, the dearth of medical records prior to 2005 and the lack of allegations regarding mental impairments between October 2005 and October 2009 does not approach the "overwhelmingly compelling non-medical evidence" that would be necessary to render the record unambiguous. *See May,* 125 F.3d 841 (quoting *Rivera v. Sullivan,* 923 F.2d 964, 969 (2d Cir.1991)) (internal quotation marks omitted).

provides that an ALJ "should call on the services of a medical advisor" in certain circumstances, rather than "shall" or "must" call on those services. *See, e.g., Eichstadt v. Astrue,* 534 F.3d 663, 666–67 (7th Cir.2008) (quoting SSR 83–20, 1983 WL 31249, at *3) (subscribing to this view). I disagree. The First Circuit's decision in *May* makes clear that an ALJ is required to employ the services of a medical advisor when the available evidence regarding disability onset is ambiguous. *See* 125 F.3d 841 (citing SSR 83–20, 1983 WL 31249).

In *May,* as in this case, the ALJ denied a claimant's DIB application at step two of the sequential evaluation process on the ground that the claimant's mental impairments were not severe prior to his DLI. *See id.* The First Circuit remanded for further administrative proceedings, holding that SSR 83–20 "*required* the ALJ to consult a medical advisor" due to the ambiguous evidence concerning the precise date on which May's impairments became severe.[27] *Id.* (emphasis added). It is consequently established in this circuit that SSR 83–20's reference to a medical advisor

is mandatory when the evidence of record regarding disability onset date is ambiguous, at least in cases in which the ALJ has previously found that the claimant was disabled on the date he or she applied for benefits.[28]

The Commissioner argues that this case is distinguishable from *May* because the ALJ in that case expressly found that the claimant was disabled on the date he applied for benefits whereas in this case, the ALJ found only that Wilson was not disabled at any time prior to his DLI. The Commissioner contends that SSR 83–20 is inapplicable in the latter scenario. I reject this argument because I find no support for it either in *May* or the language of SSR 83–20.

First, the ALJ's finding in *May* that the claimant was presently disabled was immaterial to the First Circuit's decision. *See* 125 F.3d 841. That finding was mentioned once, in the second sentence of the court's opinion. There is absolutely no indication that it factored into the court's holding that SSR 83–20 applied in that case and required the ALJ to call a medical advisor. The only factor specifically mentioned by

**27.** As in this case, the claimant challenged only the ALJ's step two finding that he did not suffer from a severe mental impairment prior to his DLI. *See May,* 125 F.3d 841. The court thus spoke in terms of the date on which the claimant's impairments became severe, but its holding would be equally applicable if an ALJ found, based on ambiguous evidence, that a claimant was not disabled prior to his or her DLI at steps four or five of the sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4)(iv-v) (discussing a claimant's ability to perform past relevant work or to make an adjustment to other work); SSR 83–20, 1983 WL 31249, at *3 ("The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death.").

**28.** The Commissioner relies on the First Circuit's statement in *Rodriguez Pagan* that "[u]se of a medical advisor in appropriate cases is a matter left to the Secretary's discretion; nothing in the Act or regulations requires it," *see* 819 F.2d at 5, but that case preceded *May* by ten years and did not mention SSR 83–20. She also cites my decision in *Hurd v. Commissioner, Social Security Administration* for the proposition that the Social Security regulations do not "explicitly direct[ ] the ALJ to consult a medical expert," *see* 2008 DNH 044, 22, 2008 WL 510148, but she neglects to mention my subsequent holding that "the circumstances of the case *required* him to obtain expert advice." *See id.* (emphasis added) (citing *Karlix v. Barnhart,* 457 F.3d 742, 747 (8th Cir.2006); *Armstrong v. Comm'r, Soc. Sec. Admin.,* 160 F.3d 587, 589 (9th Cir.1998); SSR 83–20, 1983 WL 31249).

the court that triggers the medical advisor provisions in SSR 83–20 is ambiguity in the record regarding disability onset. *See id.* As already discussed, that prerequisite was clearly met here.

The scant attention paid to the ALJ's present disability finding in *May* is not surprising, given that nothing in SSR 83–20 indicates that such a determination—or lack thereof—should matter when the evidence of record is otherwise ambiguous as to the onset of disability. As I have noted elsewhere,

> [s]ome courts attach significance to the statement in the introduction to SSR 83–20 that "in addition to determining that an individual is disabled, the decision-maker must also establish the onset date of disability." This sentence merely acknowledges the fact that an ALJ must make an onset date determination if he finds that the claimant was disabled when she applied for benefits. It does not in any way suggest SSR 83–20 is inapplicable in cases where an ALJ denies a claim for DIB by finding that the claimant was not disabled as of her date last insured.

*Ryan v. Astrue,* 2008 DNH 148, 19 n. 7, 2008 WL 3925081 (citations omitted); *see Grebenick,* 121 F.3d at 1200 (same). *But*

*see Bird,* 699 F.3d at 345 (reaching the opposite conclusion); *Eichstadt,* 534 F.3d at 667 (same); *Key v. Callahan,* 109 F.3d 270, 274 (6th Cir.1997) (same). This introductory quotation, and the numerous others that the Commissioner relies upon, are simply inapposite.[29]

The Commissioner further contends that my reading of SSR 83–20 is inconsistent with SSA policy and would impose an undue administrative burden on the agency. Again, I disagree. First, I can conceive of no reasonable public policy basis for the SSA to interpret the Social Security Act in a manner that would permit, and possibly encourage, an ALJ to avoid the inconvenience of either calling a medical advisor or making a finding regarding present disability in a case in which the evidence of a claimant's disability onset date is ambiguous. *Cf. Grebenick,* 121 F.3d at 1200–01 (citing *Reid v. Chater,* 71 F.3d 372, 374 (10th Cir.1995)) (in the absence of contemporaneous medical evidence, the obligation to call a medical advisor turns on whether the evidence regarding onset is ambiguous, not whether the ALJ could reasonably conclude that the claimant was not disabled before his or her DLI). Further, an ALJ always has the option to expressly find that a claimant is not disabled as of the date of the hearing, which would obvi-

---

**29.** These quotations (with the Commissioner's emphasis and alterations as noted) include: "[t]he onset date of disability is the first day an individual is disabled as defined in the Act and the regulations," SSR 83–20, 1983 WL 31249, at *1; the Ruling's purpose is "[t]o state the policy and describe the relevant evidence to be considered *when establishing the onset date of disability* under the provisions of titles II and XVI of the Social Security Act (the Act) and implementing regulations," *id.;* an applicant for DIB benefits cannot be found to be disabled unless "insured status is also met at a time when the evidence establishes the presence of a disabling condition," *id.;* the claimant's allegations and date of work stoppage are significant "only if it [sic] is consistent with the severity of the condition(s)

shown by the medical evidence," *id.;* and an inference regarding the disability onset date "must have a legitimate medical basis," *id.* at *3. According to the Commissioner, all of this language "clearly indicates that if an ALJ finds that a claimant is not disabled, no inquiry into an onset date is required." Doc. No. 17. That is true if an ALJ determines that a claimant is not presently disabled, *see, e.g., Cohen v. Barnhart,* 61 Fed.Appx. 722 (1st Cir. 2003) (per curiam) (unpublished table decision), but I fail to see how any of this language supports the proposition that SSR 83–20 applies only after the ALJ determines that "the claimant has established a disability, and the record is ambiguous as to the onset of that disability." *See* Doc. No. 17.

ate the need to call a medical advisor to determine a (nonexistent) onset date.[30] *See, e.g., Cohen,* 61 Fed.Appx. 722; *Rossiter v. Astrue,* 2011 DNH 115, 10–11, 2011 WL 2783997. Consequently, there is no merit to the Commissioner's concern that ALJs might be "require[d] ... to consult a medical expert regardless of whether there is any evidence of a medically determinable severe impairment or of disability...." *See* Doc. No. 17. Unfortunately, the ALJ in this case did not make any findings regarding present disability, and I am limited to reviewing those findings that she did make. *See, e.g., Letellier v. Comm'r of Soc. Sec. Admin.,* 2014 DNH 052, 22 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).

## IV. *CONCLUSION*

The ALJ in this case failed to comply with SSR 83–20, which (1) applies regardless of whether the ALJ has made a finding regarding post-DLI disability, *see, e.g., Grebenick,* 121 F.3d at 1200–01, and (2)

requires use of a medical advisor whenever the evidence regarding a claimant's disability onset date is ambiguous. *See, e.g., May,* 125 F.3d 841. Although a DIB claimant bears the burden to prove that he or she was disabled during the insured period, *see id.,* this does not relieve the ALJ of the duty to apply SSR 83–20 as necessary to ensure that the record is fully developed. *See, e.g., Mason v. Apfel,* 2 F.Supp.2d 142, 150 (D.Mass.1998).[31]

Accordingly, I deny the Commissioner's motion to affirm (Doc. No. 12) and grant Wilson's motion to reverse or remand (Doc. No. 9). Pursuant to sentence four of 42 U.S.C. § 405(g), I remand the case to the Social Security Administration for further proceedings consistent with this decision.[32]

SO ORDERED.

**30.** The Commissioner points me to the SSA's internal guidance manual for the proposition that it serves "no purpose to make findings regarding the claimant's impairments or ability to work after the date last insured," *see* Social Security Administration, Office of Hearings and Appeals, Litigation Law Manual § I–5–4–40 (Sept. 28, 2005), but the section from which that quotation is taken concerns cases—not at all like the present one-in which "cessation of a prior period of disability is confirmed" and the claimant is seeking a subsequent period of disability. *Id.*

**31.** Prior decisions of this court have either not followed the reasoning of the remaining cases cited by the Commissioner or distinguished those cases on their facts, and the Commissioner has offered no persuasive reason for me to reach different conclusions. *See Sam v. Astrue,* 550 F.3d 808, 810 (9th Cir.2008), *distinguished by Rossiter,* 2011 DNH 115; *Eichstadt,* 534 F.3d at 667, *declined to follow by Rossiter,* 2011 DNH 115, *and Ryan,* 2008 DNH 148; *Nix v. Barnhart,* 160 Fed.Appx. 393, 396–97 (5th Cir.2005) (per curiam), *declined to follow by Rossiter,* 2011 DNH 115, *and Moriarty v. Astrue,* 2008

DNH 158, 2008 WL 4104139; *Scheck v. Barnhart,* 357 F.3d 697, 701 (7th Cir.2004), *distinguished by Rossiter,* 2011 DNH 115; *Asbury v. Comm'r of Soc. Sec.,* 83 Fed.Appx. 682, 686 n. 3 (6th Cir.2003), *distinguished by Rossiter,* 2011 DNH 115; *Key,* 109 F.3d at 274, *declined to follow by Rossiter,* 2011 DNH 115, *Moriarty,* 2008 DNH 158, *and Ryan,* 2008 DNH 148; *Sousa v. Astrue,* No. 08–218S, 2009 WL 3401196, at *9 (D.R.I. Oct. 21, 2009), *distinguished by Rossiter,* 2011 DNH 115; *Kovacs v. Astrue,* No. 08–241, 2009 WL 799407, at *4 (D.Me. Mar. 23, 2009), *rep. & rec. adopted,* 2009 WL 982235 (D.Me. Apr. 10, 2009), *declined to follow by Rossiter,* 2011 DNH 115; *Lisi v. Apfel,* 111 F.Supp.2d 103, 111 (D.R.I.2000), *declined to follow by Rossiter,* 2011 DNH 115. The Second Circuit's decision in *Baladi v. Barnhart* is similarly distinguishable. *See* 33 Fed.Appx. 562, 564 (2d Cir.2002) (ALJ expressly found that the claimant was not disabled as of the date of the hearing). Finally, I decline the Commissioner's invitation to adopt the reasoning in *Robinson v. Apfel,* 229 F.3d 1158 (9th Cir. 2000) (unpublished table decision), a case which has never been cited by any court, for the reasons discussed above.

**32.** On remand, the ALJ is free to conclude that Wilson is not entitled to benefits, but only if she first (1) finds on the basis of substantial evidence that he is not presently disabled, or (2) relies on the opinion of a medical advisor to find that Wilson was not disabled prior to his DLI.